MaddeN, Judge,
delivered the opinion of the court:
The plaintiff sues to recover $500 which he was required to pay as an excise tax on wagering which, the Government alleges and he denies, he engaged in. The period for which the plaintiff paid the $500 tax was one day, June 30, 1952.
Section 3285 of the Internal Revenue Code of 1939, added to the Code by section 471(a) of the Revenue Act of 1951, c. 521, 65 Stat. 452, 529, imposed an excise tax of 10% on wagers and provided in subsection (d):
(d) Persons Liable for Tax. — Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under this subchapter on all wagers placed with him. Each person who conducts any wagering pool or lottery shall be liable for and shall pay the tax under this subchapter on all wagers placed in such pool or lottery.
The plaintiff says that he was not, at the time in question, engaged in the business of accepting wagers, nor was he conducting a wagering pool or lottery.
The plaintiff, personally and through corporations which he owned, was engaged in Indianapolis, Indiana, in the printing of baseball pool tickets under trademarks which he owned. The plaintiff, just prior to the time here in question, had also been engaged in the sale of the baseball pool tickets, through agents or dealers, to customers who desired to gamble on the size of scores made in professional baseball games. The several kinds of tickets were placed by the plaintiff in stores or other outlets where single tickets would be sold to customers for five, ten or twenty-five cents. If the customer bought a ticket which turned out to be a “hit”, he could cash his ticket for a specified large sum of money.
*35 When section 3285 was enacted in 1951, the plaintiff and other operators engaged in the baseball pool ticket business in Indianapolis met and informally agreed that they would reduce the size of the winners’ prizes in order to make up for the cost of the ten percent tax. The plaintiff paid the tax and reduced the size of his prizes but his information was that his competitors did not pay the tax and did not reduce the size of the prizes. The plaintiff lost money and complained to the Government about the noncollection of the tax from his competitors, and also about the fact that some of his competitors were operating their lotteries through the agency of supposedly tax-exempt organizations such as the American Legion, the Veterans of Foreign Wars, and fraternal lodges.
Effective June 30, 1952, the tax day in question in this suit, the plaintiff made a realty and equipment lease to the Rushville, Indiana, Lodge of the Loyal Order of Moose. Rushville is about 40 miles from Indianapolis. The plaintiff owned a building in Indianapolis and used the first floor for printing the baseball pool tickets and for other printing. He used the second floor for the operation of the ticket distributing business. He leased the second floor with its office equipment, together with two automobiles, to the Moose for one year at $400 a month. On the same day, the plaintiff’s printing companies entered into a manufacturing agreement and license of trademarks by which the Moose was licensed to use the trade name and trademarks by which the plaintiff’s baseball pool tickets had become known to the public.
The persons who had been the plaintiff’s operating employees became employees of the Moose, and ran the business as it had been run before, with some slight supervision by the secretary of the Moose Lodge who of course did not know as much about the lottery business as the experienced employees. The plaintiff loaned the Lodge $9,000 as initial working capital. It was necessary to pay the winning tickets as soon as they were presented, and before collection was made from the numerous dealers for tickets sold by them. The Moose Lodge bought the sheets of tickets from the plaintiff and his printing companies at the price at which *36 the tickets had formerly been sold. The plaintiff determined how.many tickets should be printed.
Things went along this way for about three months, i.e. until about September 30,1952, when the Lodge decided that it was probably not exempt from the wagering tax, and that the operation was not profitable enough to compensate for the risks and the stigma which attached to the business. Thereupon the plaintiff consented to the termination of his contracts with the Moose, took his building and equipment and employees back, and resumed the operation of the lottery business. The Moose had, during the three months of their operation, repaid the $9,000 loan, paid the $400 a month rent, paid for the tickets 'bought from the plaintiff, and paid the employees’ salaries, and the taxes on their salaries. It had made a profit of some $2,000 on the operation.
The Government says that on June 30 and during the three months thereafter the plaintiff was engaged in wagering. We think not. We think that only by permitting the law of inertia to carry what the plaintiff was doing before June 30 over to what he was doing after October 1 can he be said to have been engaged in wagering between those two dates. The plaintiff had a long established and profitable business of printing these copyrighted and fancy-named baseball pool tickets. The profit had been taken out of the distribution of the tickets by the 10 percent excise tax. If someone exempt from the tax would take over the distribution operation, but would buy the tickets from his printing enterprise, that would keep the printing enterprise going. If one wants to sell a going business to a buyer who has no money, but who gives promise of making money out of the business, and if it takes immediate cash to keep the business going until its proceeds begin to come in, it is necessary to achieve the sale, and it may be prudent, to advance that cash.
The test, of course, of whether one is engaged in wagering, is whether he is risking his money in a game of chance in which he may win, or lose, depending on the eventuality. The plaintiff was not in that situation during the period in question. If the lottery was profitable to the operator, the Moose got the profit. If luck favored the ticket buyers, the Moose took the loss. The fact that one lends money, or leases *37 a building, to a gambler may impair Ms chances of being paid the loan or the rent, but it does not require him to buy a gambler’s license or pay an excise tax which is imposed on gamblers.
The Government has filed a counterclaim for $40,704.03, plus interest, based upon assessments made by it against the Moose Lodge and the plaintiff for wagering taxes for the months of June, July, August and September, 1952. The Government’s brief mentions the counterclaim but does not discuss it. The assessment for June seems to have been applicable only to June 30, the one day for which the plaintiff paid the $500 involved in tMs suit. The plaintiff’s activities in July, August and September were the same as those of June 30. It follows, then, that the plaintiff was not engaged in wagering at any time covered by the assessments recited in the counterclaim, and is not indebted to the Government for taxes for that period.
The plaintiff is entitled to a judgment for $500, with interest as provided by law. The defendant’s counterclaim is dismissed.
It is so ordered.
LittletoN, Judge {Ret.), and Laeamoee, Judge, concur.